## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Joshua Borges, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) in the FBI's Boston Division. I have been in this position since May 2018. I am also a Supervisor with the U.S. Customs and Border Protection (CBP), Office of Field Operations (OFO) and have been a sworn CBP officer since April 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the cellphone seized by CBP from QIHONG SONG, with International Mobile Equipment Identity (IMEI) 359583829686452 ("Target Device"), during a CBP border search on July 22, 2024, CBP turned the device over to Immigration and Customs Enforcement (ICE) along with other personal property from SONG. The personal property from SONG along with the Target Device were turned over to the FBI on July 26, 2024 and is currently held at the FBI resident agency at 100 Middle Street, Portland, Maine. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of Title 18, U.S.C. Section 1546 (Fraud and misuse of visas, permits, and other documents) occurred. There is also probable cause to search the Target Device described and shown in Attachment A for evidence and instrumentalities of these crimes as described in Attachment B.

## PROBABLE CAUSE

4. On July 25, 2024, the FBI Portland Resident Agency (RA) was notified of an attempted border crossing at Coburn Gore, Maine Port of Entry (POE) that occurred on July 21, 2024. SONG attempted to gain entry into Canada with a document she represented as her own Belgian passport although SONG does not have Belgian citizenship or a legal Belgian passport.

5. The following information is based on a review of United States (US) Customs and Border Protection (CBP) reports and records:

    a. On June 24, 2024, SONG submitted an Electronic System for Travel Authorization (ESTA) application to enter the US and represented she was a citizen of Belgium.

    b. An ESTA application enables citizens of participating countries to travel to the US for stays of 90 days or less without having to obtain a visa. An applicant bearing only Chinese citizenship would not be eligible to apply for visa-free entry to the US and would require a visa.

    c. On July 14, 2024, SONG and her husband departed Shanghai Pudong International Airport (PVG) on All Nippon Airways (NH) flight 968. SONG transited through Japan and arrived in the US at Chicago O'Hare International Airport (ORD) on NH flight 112 using the Belgian passport. SONG was admitted to the US as "WT – Visa waiver visitor" based on her ESTA application representing that she was a citizen of Belgium. As a CBP officer, I know that not all US ports of entries stamp traveler passports due to technical advances in border crossing technology.

d. On July 21, 2024, at 6:40 PM eastern standard time (EST), SONG presented herself as outbound from the US at the Canadian Woburn POE, which is located on the international border of the US in the State of Maine.

e. Canada Border Services Agency (CBSA) scanned the Belgian passport presented by SONG in order to cross the border. The passport would not scan correctly in the document reader; SONG then presented a Chinese passport with a Canadian visa. When CBSA scanned SONG's Chinese passport, CBSA reportedly received an alert from the International Criminal Police Organization (INTERPOL) and Belgium indicating SONG was not a Belgian citizen. CBSA alerted US CBP officers at Coburn Gore POE that the Belgian document was either altered or fraudulent.

f. CBSA returned SONG to the US at Coburn Gore POE on July 22, 2024, at 12:35 pm EST. The Coburn Gore POE address is ME-27, Coburn Gore, Maine 04936.

g. SONG was interviewed on July 22, 2024, by US CBP officers in which she admitted to acquiring the Belgian passport through an agency whose name she could not recall. SONG stated she had paid approximately 38,000 euros for the document. SONG noted that she was the only family member who did this.

h. In her interview, SONG stated she and her husband had entered the US in Chicago on July 14, 2024, to attend a conference and then proceeded to Colby College in Waterville, Maine to visit a family member. SONG, her

husband, and niece planned to attend another conference in Montreal, which is why they were attempting to depart the US at Coburn Gore POE.

6. During an examination of SONG's phone conducted by CBP pursuant to their border search authority, officers identified instructions for how SONG should use the passport, to include the recommendation of building a travel history before trying to enter Belgium. Additionally, instructions were provided on how to respond to questions from immigration officers should she be asked how she obtained her passport.

7. Stamps and documentation in the Belgian passport SONG had represented as her own included the following:

    a. Admitted to Thailand on October 11, 2023, and departed on October 12, 2023.

    b. Admitted to China on May 16, 2024, and departed on May 27, 2024.

    c. There is another stamp in the passport from an unknown country. It appears SONG entered this country on June 4, 2024, and departed on June 7, 2024.

    d. Admitted to China on June 25, 2024, and departed on July 13, 2024.

    e. There is a Chinese visa for SONG issued on July 8, 2024, indicating she was permitted to stay in China until July 29, 2024.

8. Also, according to CBP records, SONG has an active Chinese passport, E50259205, issued on May 6, 2015, and set to expire on May 5, 2025. SONG has traveled extensively to the US on this active Chinese passport:

    a. On October 3, 2016, SONG traveled from China to Los Angeles International Airport (LAX) and departed on October 7, 2016, from Minneapolis-St. Paul International Airport (MSP) for Toronto, Canada.

    b. SONG utilized this Chinese passport previously to transit the Coburn Gore POE in a passenger vehicle. On October 13, 2016, SONG entered the US with a B2 Temporary Visa at this crossing. SONG departed the US on October 17, 2016, from LAX to China. SONG, among others, was interviewed on October 13, 2016, upon entry to the US at the Coburn Gore POE. The driver of the vehicle stated he was transporting SONG, her husband, and her niece to Belfast, Maine, where SONG's husband had a business meeting.

    c. SONG most recently entered the US on this Chinese passport on August 11, 2019, at Boston's Logan Airport (BOS) on a flight from Iceland. She departed August 15, 2019, out of John F. Kennedy International Airport in New York (JFK) to China.

9. CBP records also indicate SONG previously traveled to and from the US on an older Chinese passport in July 2010, February 2013, May 2014, and December 2014.

10. Based on the foregoing I believe Song to have used a fraudulent foreign passport to enter the United States and to have continued to possess that document while in the District to Maine. I also have probable cause to believe, and I do believe, that the Target Device will contain evidence of the crime of possessing and using fraudulent entry documents. Specifically, I believe the device will contain information about: where, when, and how Song obtained the document; Song's

intent, state of mind, or object in possessing and using the document; the identities and intent of others involved in producing and providing the document for Song's use.

## TECHNICAL TERMS

11. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.

Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross

state and international borders, even when the devices communicating with each other are in the same state.

12. Based on my training, experience, and research, I believe that the Target Device has capabilities that allow it to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

13. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, websites and other content that have been viewed via the Internet are typically stored for some period of time on the accessing device. This information can sometimes be recovered with forensics tools.

14. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

16. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

17. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described and shown in Attachment A to seek items described in Attachment B.

Respectfully submitted,

Joshua Borges
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Jul 30 2024

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title